C. ANSON GARRETT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Garrett v. Commissioner
Docket No. 9106-92
United States Tax Court
T.C. Memo 1994-70; 1994 Tax Ct. Memo LEXIS 74; 67 T.C.M. (CCH) 2214; February 23, 1994, Filed *74 Decision will be entered under Rule 155. For petitioner: Richard A. Cummings, T. Steve Joyce, and Janice E. Ervin. For respondent: Mary P. Kimmel. DAWSON
DAWSON
MEMORANDUM OPINION DAWSON, Judge: Respondent determined deficiencies in, and additions to, petitioner's Federal income taxes as follows: Addition to Tax
Year
Deficiency
Sec. 6651(a)(1)
1987
$ 117,077
$ 29,423
1988
222,059
55,515
Some concessions have been made by respondent. The following issues remain for decision: (1) Whether petitioner realized gain in excess of his basis from the sale of his beneficial interest in a trust and, if so, the amount of such gain; (2) whether the amount of the gain is excludable from petitioner's gross income under section 102(a) [1] as having been received in lieu of inheritance or under section 104(a)(2) on account of personal injury; (3) whether petitioner received gross income in 1987 resulting from discharge of indebtedness under section 61(a)(12); and (4) whether petitioner is liable for section 6651(a)(1) additions to tax for failing to file timely Federal income tax returns for 1987 and 1988. *75 The facts of this case were fully stipulated pursuant to Rule 122. The stipulation of facts and attached exhibits are incorporated herein by this reference. The pertinent facts and chronology are set forth below. C. Anson Garrett (petitioner) was a resident of Eagle, Idaho, when he filed his petition in this case. Petitioner was born on January 1, 1936. Dorothy E. Garrett (the decedent) was the mother of petitioner and Nancy Garrett Kolenda (Nancy). Petitioner has two children, C. Anson Garrett III and Anita Jean Garrett Carter. [2] Nancy has three children, Kari, Kristin, and Jason. On September 10, 1977, the decedent sold 120,000 shares of common stock of Garrett Freightlines, Inc., to Nancy for $ 6 million. She *76 paid $ 300,000 cash and gave the decedent a promissory note for $ 5,700,000. The note provided for periodic interest payments and, beginning January 1, 1983, for principal payments. Nancy executed a security agreement which pledged the shares of stock as collateral. The security agreement encumbered certain assets owned by Nancy, primarily her interest in a health club facility in Pocatello, Idaho, known as Sports World, Inc. On November 29, 1977, the decedent executed a Trust Agreement known as the Dorothy E. Garrett Trust (hereinafter the trust) which was funded by the assignment and transfer of Nancy's promissory note to the Idaho Bank & Trust Co. (hereinafter the bank or the trustee). The trust agreement provided that the decedent would receive income from the trust in monthly installments during her lifetime. Upon her death the trust was to become irrevocable and the trustee was to pay estate and inheritance taxes. The trust agreement further provided as follows: The Trustee shall hold, manage and control the property comprising the trust estate, collect the income therefrom, and out of same, shall pay all taxes and other incidental expenses of the trust, including *77 its own commissions, and shall hold or distribute the trust estate and the income therefrom to or for the benefit of my children and grandchildren as hereinafter provided. * * * (a) The Trustee shall pay eighty percent (80%) of the income earned on the trust corpus to my beloved children, NANCY GARRETT KOLENDA and C. ANSON GARRETT, II, in equal parts, in monthly or other convenient installments as the designated beneficiaries may from time to time direct. In such instance and event as either of my children should predecease prior to the termination of this trust, then and in that event, the income earned on the trust corpus as herein provided shall be paid to those surviving issue of said predeceased child as directed in Paragraph IV (b) hereinafter. (b) The Trustee shall pay twenty percent (20%) of the income earned on the trust corpus to my beloved grandchildren in equal parts monthly or from time to time as said beneficiaries shall designate if of age of majority, or as designated by said minor child's natural guardian limited to my surviving issue. If the natural guardian (limited to my issue) is not surviving, determination of payments of income shall be within the discretion *78 of the Trustee herein named. (c) Upon the first grandchild of Grantor attaining his or her fortieth (40th) birthday, the Trustee shall apportion twenty percent (20%) of the trust corpus and undistributed income into equal shares, one (1) share for each living grandchild, and each such share shall be distributed to said grandchild upon attaining his or her fortieth (40th) birthday. Upon the death of either child of Grantor, the remaining undistributed eighty percent (80%) of corpus and undistributed income shall be separated into two (2) equal shares, one (1) share to be equally apportioned to the surviving issue of the predeceased child of Grantor. If any of such surviving issue is at least forty (40) years of age, such share shall be immediately distributed to such issue and the trust terminated as to said beneficiary. Upon the death of the surviving child of Grantor, the remaining share shall be equally apportioned to the surviving issue of said predeceased child and distributed to such issue upon his or her attaining their fortieth (40th) birthday and this trust shall then terminate. (d) In such instance and event as a grandchild shall not survive to the age of forty (40) *79 years to receive his or her distributable share of this trust, the issue of said predeceased grandchild shall receive the share of his or her predecessor. If such issue are under age of majority, the share of such issue shall be retained by the Trustee until majority age. If a predeceased grandchild shall not leave surviving issue, his or her share of the trust shall be distributable to his or her surviving brothers and/or sisters equally.
On the same day, November 29, 1977, the decedent executed her Last Will and Testament, which, among other things, directed her personal representative, also the bank, to secure payment of all Federal taxes from the trustee of her trust out of the assets held in the trust. The will also provided for specific bequests from property other than the trust assets. The decedent died on April 7, 1981. Her estate was administered by the bank, as personal representative, through the trust. The bank filed the United States Estate Tax Return (Form 706) on December 28, 1981, which reported a taxable estate of $ 3,855,444.49 with a net estate tax due of $ 1,480,254.91. After an estate tax examination, the bank, as personal representative, agreed that *80 there were adjustments to the taxable estate which resulted in a corrected taxable estate of $ 4,088,977.72, with an increase in estate tax due of $ 121,726.93. The bank filed an application for an extension of time to pay the Federal estate tax. Most of the gross estate consisted of the $ 5,700,000 promissory note given by Nancy to her mother. The same note was the primary asset of the trust being administered by the bank. The bank, as personal representative, made the following payments to beneficiaries of the estate: First Congregational Church
$ 924.12  Jeanette Horton
16,823.47
The Irene Munn Estate
16,823.47
Dorothy Schneider
16,823.47
Nancy Kolenda
53,369.16
Nancy Kolenda
79,980.31
Petitioner was indebted to the estate in an amount in excess of his share of the estimated residuary estate. He requested that his share of the residuary estate be applied against his note obligation and that the trustee of the trust loan him $ 82,033.68 to enable him to pay in cash the remainder of the obligation owed to the estate. On October 25, 1982, petitioner and Nancy executed a Memorandum Agreement with the bank, acting as both the personal representative of the estate *81 and as trustee of the trust, which memorialized the loan made by the bank to petitioner. That agreement provided, in pertinent part, as follows: 2. Loan to Anson. From the proceeds of Nancy's principal prepayment, the Trustee agrees to loan and Anson agrees to borrow the sum of $ 82,033.68 or as much as is necessary to pay the balance he will owe the estate after his residuary share is applied against his obligation. Said loan shall be repaid on the following terms: a. Interest will commence accruing on the unpaid principal balance at the rate of 12% per annum. b. On the first day of January, 1983 and on the first day of each calendar quarter thereafter, until January 1, 1988, Anson will pay the Trustee accrued interest plus a sum equal to 2.5% of the initial principal balance. c. On January 1, 1988 the remaining outstanding principal balance plus accrued interest shall be paid in full. The loan proceeds of approximately $ 82,033.68 shall be paid on behalf of Anson directly to the Estate. 3. Security for Loan. As evidence of Anson's remaining obligation, Anson shall execute a non-negotiable note in the amount equal to outstanding balance of the loan, estimated *82 at $ 82,033.68, with terms of repayment corresponding to the terms set out in the preceding paragraph. To secure payment of said note, Anson agrees to execute an assignment of his share of the income distributions from the trust and, in addition, to obtain a life insurance policy, satisfactory to the trustee, in an amount not less than $ 82,000.00 and naming the Trustee as beneficiary to the extent of its interest. Anson shall pay the premiums due on said policy; and he shall irrevocably assign his interest in said policy to the Trustee to the extent of the Trustee's interest. Premium payments shall be withheld from his distributive share of the trust income over and above that portion of his distributive share which is to be applied to loan repayment. The parties agree that for payment of the note the holder may only look to Anson's right to the income generated from the trust assets and, if necessary, to the insurance proceeds. Anson shall not otherwise be personally liable to repay the loan.
On January 5, 1983, petitioner gave the bank, as trustee, his promissory note for the loan, the terms of which are consistent with the provisions of the Memorandum Agreement. *83 Petitioner and Nancy also agreed with the trustee that the principal of the trust, not the income, was to be used to pay the "death" tax obligations. Petitioner agreed that if the tax obligations exceeded the amount that the principal could satisfy, then all assets of the trust, whether in income or principal amounts, should be applied to meet the tax obligations. If that still was insufficient to satisfy the tax obligations, then petitioner agreed to be liable, along with other trust and estate beneficiaries, to pay the tax obligations to the extent that he had received trust and/or estate distributions. Nancy defaulted in 1983 on her $ 5,700,000 note. On November 6, 1984, petitioner and his children filed a complaint against the bank in the District Court of the Sixth Judicial District for Bannock County, Idaho, for mismanaging the trust's assets. They alleged that the bank, as pledgeholder, had breached its duty under the security agreement by permitting improper and imprudent investments of funds held as collateral, and that such improper investments resulted in a loss of security for the promissory note. As a result, they alleged that the collateral securing the promissory *84 note had been depleted from over $ 6,600,000 as of November 30, 1977, to not more than $ 2,200,000 as of September 30, 1984. They further alleged that they suffered actual damages of $ 475,000, representing lost income to petitioner and his children. They also requested that the bank restore $ 3,500,000 to the trust estate to render the estate whole. On January 31, 1985, petitioner and his children filed an amended complaint in the Bannock County suit, alleging, in addition to breach of fiduciary duty, that the bank had a conflict of interest and had made false representations. Petitioner and his children also alleged they had been damaged in an amount in excess of $ 4 million. They requested that the bank pay $ 4 million to the trust to render the estate whole, as well as pay petitioner and his children $ 2 million, which they alleged was income lost to them. They also requested punitive damages in an amount equivalent to the compensatory damages. On February 5, 1985, Nancy executed an Asset Turnover Agreement with the bank. Essentially she turned over to the bank, as trustee, the assets used to secure her promissory note. The main asset was Nancy's interest in Sports World, *85 Inc. The bank as trustee of the trust accepted all of Nancy's collateral assets in exchange for cancelling the balance of her note. At the time of the asset turnover, the assets in the trust had a basis of $ 1,902,864. On April 7, 1986, petitioner and his children filed a second lawsuit in the District Court of the Fourth Judicial District for Ada County, Idaho, alleging that the bank breached its fiduciary duty, as personal representative of the estate, and sought damages of $ 1 million to restore the value of the trust which was allegedly lost as a result of the bank's conduct during the lifetime of the decedent. On or about May 12, 1986, the bank filed an answer to the amended complaint and a counterclaim against petitioner in the Bannock County lawsuit. The counterclaim sought payment of all delinquent payments on the $ 82,033.68 loan from the trust to petitioner and insurance premiums paid by the bank on petitioner's behalf. In his answer to the counterclaim, petitioner denied he was liable for any payments under the October 25, 1982, Memorandum Agreement. On December 31, 1987, petitioner and his children, Nancy and her children, and the bank, as trustee of the trust and *86 as personal representative of the estate, entered into a Purchase and Sale and Settlement Agreement (the agreement). On that date the outstanding principal balance of petitioner's loan from the trust was $ 73,930 and the amount of insurance premiums paid by the trust (that were supposed to be paid by petitioner) was $ 16,482, for a total of $ 90,412. Pursuant to the agreement, all beneficiaries of the trust, including petitioner and his children, agreed to sell to the bank, and the bank agreed to purchase, all interests in the trust and estate. The agreement with petitioner and his children included the dismissal with prejudice of all the lawsuits filed against the bank. The bank agreed to do the following: (1) Pay petitioner and his children the sum of $ 1,500,000 cash; (2) release its interest in the life insurance policy insuring the life of petitioner; and (3) dismiss with prejudice its counterclaim against petitioner and release all claims it or the trust may have against him for payment of the outstanding balance due on the trust's loan to him. In addition, the bank also agreed to: defend, indemnify and hold the Anson Garrett and Kolenda families harmless from any *87 liability of the Estate or Trust with respect to the Estate notes and/or any of the devises provided in Dorothy E. Garrett's Last Will and Testament which was probated in the Estate. IB&T further agrees to defend, indemnify and hold harmless the Anson Garrett and Nancy Kolenda families from any liability, cost, loss or expense arising out of or in any way connected with demands, assessments or claims by the Internal Revenue Service, or any state authority, for the payment of or collection of (1) any death taxes, including interest and penalties, occasioned by or incident to the death of Dorothy E. Garrett, and (2) any federal or state income taxes, including interest and penalties, charged to the Trust, or to the Estate, at any time subsequent to the death of Dorothy E. Garrett, to the extent the same are in excess of such taxes heretofore paid by the Trust and/or taxes charged to the Anson Garrett Family or the Kolenda Family by reason of distributions, whether constructive or actual, made to the families, as reflected and reported on any IRS or state tax form to the Anson Garrett families or the Nancy Kolenda families by reason of this paragraph.
Petitioner and his children *88 agreed to: (1) Assign their interests in the estate and the trust to the bank; (2) release the bank from any liability as trustee of the trust and as personal representative of the estate; and (3) dismiss with prejudice both the Bannock County and Ada County lawsuits. Petitioner and his children paid $ 447,040 in 1988 for attorneys' fees and other costs to effect the sale of their interests in the trust and in the prosecution and settlement of the litigation with the bank in Bannock County and Ada County. The total basis of the assets in the trust was $ 1,805,583 as of December 31, 1987. The $ 1,500,000 paid to petitioner and his children by the bank, pursuant to the agreement, was received and made available in 1988. On December 31, 1987, the outstanding Federal estate tax liability, excluding interest, was $ 1,305,932. As of December 31, 1987, the date of sale, the bank, as trustee of the trust and as personal representative of the estate, held assets valued at approximately $ 1,941,953 and liabilities of $ 3,705,932, consisting of the outstanding Federal estate tax ($ 1,305,932), the amounts due petitioner and his children ($ 1,500,000), and the amounts due Nancy and her children *89 ($ 900,000). As of December 31, 1987, the Internal Revenue Service seized trust assets to secure payment of the outstanding Federal estate tax liability. The assets seized included the real and personal property of Sports World, Inc.; joint venture property owned by the trust in Ada County, Idaho; Northwest Savings & Loan stock owned by the trust; Sports World, Inc. stock owned by the trust; and, with the exception of petitioner's outstanding note, all notes receivable owned by the trust. In January 1988, petitioner and his children placed $ 1,002,960 of the $ 1,500,000 they received from the bank in the Garrett Family Trust. They receive income from that trust at least quarterly. Petitioner receives 83.33 percent of the income and the balance is divided equally between his two children. On December 12, 1988, the bank submitted an Offer in Compromise pertaining to the unpaid withholding, FICA, and FUTA taxes, plus statutory additions, of Sports World, Inc. On December 14, 1988, the bank submitted an Offer in Compromise pertaining to the outstanding Federal estate tax liability. The total amount of $ 675,527 cash and a deed to the real property of Sports World, Inc., were offered *90 to compromise all the liabilities covered by both offers. On December 22, 1988, the Internal Revenue Service accepted both offers for $ 675,527 cash, the deed to the real property of Sports World, Inc. (value credited at $ 579,629), and forgave the remaining Federal estate tax liability (including interest) and $ 17, 709.13 in employment tax liabilities. Petitioner's Federal income tax return for 1987 was due to be filed on April 15, 1988. He filed an Application for Automatic Extension of Time To File U.S. Individual Income Tax Return (Form 4868) extending the due date of his 1987 return until August 15, 1988. He estimated his total tax liability for 1987 as zero and determined that no tax balance was due. Petitioner also filed an Application for Additional Extension of Time To File U.S. Individual Income Tax Return (Form 2688) extending the due date of the 1987 return until October 15, 1988. On Form 2688 the following reason was stated for needing an additional extension of time to file the 1987 return: "Taxpayer is waiting for information from third parties that is essential to file a complete and accurate return." Petitioner's Federal income tax return for 1987 was not received *91 and filed by the Ogden Service Center until February 6, 1989. On that return petitioner reported interest income of $ 27,498 received from Idaho State Bank; adjusted gross income of $ 11,641; taxable income of $ 5,961; and tax of $ 836 which was offset by a general business credit, thus resulting in no reported income tax due. Petitioner did not report any gross income received in 1987 from forgiveness of indebtedness under the provisions of the December 31, 1987, agreement whereby the bank dismissed its counterclaim against him for failing to pay his loan to the trust in the amount of $ 90,412. Petitioner's Federal income tax return for 1988 was due to be filed on April 15, 1989. He filed an Application for Automatic Extension of Time To File U.S. Individual Income Tax Return (Form 4868) extending the due date of his 1988 return until August 15, 1989. Petitioner estimated his total tax liability for 1988 as zero and determined that no tax balance was due. He also filed an Application for Additional Extension of Time To File U.S. Individual Income Tax Return (Form 2688) extending the due date of the 1988 return until October 15, 1989, which was a Sunday. On Form 2688 the following *92 reason was stated for needing an additional extension of time to file the 1988 return: "Taxpayer is waiting for information from third parties that is essential to file a complete and accurate return." The postmark on the envelope in which the 1988 return was mailed to the Ogden Service Center bears the date of October 16, 1989. Petitioner's Federal income tax return for 1988 was received and filed by the Ogden Service Center on October 18, 1989. On that return petitioner reported taxable interest income, totaling $ 60,820, received from American Title and the Garrett Family Trust; the total amount of $ 122,124 in capital gain received from the sale of his "interest in D. Garrett Trust" and $ 42,715 received from the installment sale of land in Bannock County in 1984; adjusted gross income of $ 223,591; and total tax due of $ 48,899, none of which had been paid as estimated tax. On the Disclosure Statement under Section 6661 (Form 8275) attached to petitioner's Federal income tax return for 1988 he reported the allocation of his basis and capital gain from the $ 1,500,000 in gross proceeds received from the bank, as follows: C.A.
C.A.
Anita
Garrett II
Garrett III
Garrett
Income
Remainder
Remainder
Total
Interest
Interest
Interest
Regulation 20.2031-10 Factor
.65560
.17220
.17220
Gross proceeds
$ 1,500,000 Attorney fees/expense
447,040 Net proceeds
1,052,960 $ 690,320
$ 181,320
$ 181,320
Basis in trust asset
1,805,583 Garrett family interest
48%
Basis to be allocated
866,680 568,196
149,242
149,242
Capital gain
$ 122,124
$ 32,078 $ 32,078 *93 Petitioner did not allocate any portion of the net proceeds ($ 690,320) he claimed he received from the sale of his income interest in the trust to the settlement of his lawsuits against the bank. In the notice of deficiency dated February 4, 1992, respondent determined that petitioner received gross income of $ 90,412 in 1987 as forgiveness of indebtedness; that he received additional income of $ 333,320 in 1987 and $ 1,127,826 in 1988 from the settlement proceeds of the lawsuits; that petitioner was allowed certain section 212 expenses, including attorneys' fees, in both years; and that petitioner's standard deduction was disallowed. Issue 1. Determination of Basis and Gain
The parties agree that the critical document in this case is the Purchase and Sale and Settlement Agreement executed on December 31, 1987, by petitioner and his two children, his sister and her three children, and the bank. That agreement became effective the day it was signed and essentially severed the parties' business relationships. Where previously the bank had been trustee of the trust, it owned, after the agreement, all beneficial interests in the trust and all encumbered assets of the trust, *94 and it assumed all liabilities of the trust. Where previously petitioner had a life estate in 40 percent of the trust's income, he had, after the agreement, an interest in $ 1,500,000 cash and no interest in the trust, and he was indemnified against any possible Federal estate tax obligation as a beneficiary or transferee of his deceased mother's estate. His indebtedness to the bank was also forgiven. It is significant that petitioner shared in fashioning the mold in which the agreement was cast. Thus, the substance of the agreement is actually what was done. Indeed, petitioner reported on his 1988 Federal income tax return a capital gain of $ 122,124 from the sale of his income interest in the trust. However, he now contends that, because of a computational error, the amount of the capital gain should be $ 99,846.17. Adhering to the provisions of the agreement, and contrary to the determination made in the notice of deficiency that petitioner received ordinary income from settlement of lawsuits, respondent now acknowledges that petitioner realized a capital gain. However, respondent disagrees with petitioner's claimed method of allocating his share of basis in the trust, *95 his allocable share of the cash proceeds received, and his allocable share of the alleged Federal estate tax liability assumed by the bank. Hence, respondent contends that out of the total basis ($ 1,805,583) in the trust's assets, $ 599,299.26 should be allocated to petitioner's basis; that $ 433,047.05 of the $ 1,305,932 owed on the Federal estate tax liability should be allocated to petitioner in 1987; that the basis in the trust's assets remaining from 1987 should be $ 166,252.61; and that when the $ 166,252.61 is subtracted from petitioner's allocable share ($ 1,037,071) of the cash proceeds ($ 1,500,000), petitioner realized a capital gain of $ 870,818.40, which he must recognize in 1988. In order to calculate the correct amount of petitioner's gain, we must decide: (1) Petitioner's allocable share of basis in the trust; (2) his allocable share of the cash proceeds received; and (3) whether petitioner received discharge of indebtedness income from the sale of the trust's encumbered assets. While petitioner maintains that his reliance on section 20.2031-10, Estate Tax Regs., [3] on his 1988 Federal income tax return was correct, it is now his position that, because of a computational *96 error, the amount of his capital gain should be $ 99,846.17. Respondent contends that petitioner's calculation of his capital gain is incorrect for several reasons. First, it is asserted that petitioner's calculation allocates too much basis to himself and too little to his two children. Respondent argues that petitioner, who had an income interest of 40 percent, incorrectly multiplied his family's combined interest of 48 percent to determine the basis "available to the family", then applied the tables in section 20.2031-10, Estate Tax Regs., to conclude that his portion represented 65.5 percent of the basis *97 "available to the family" based on the family's combined 48-percent interest in the trust. We agree with respondent that petitioner's use of the section 20.2031-7, Estate Tax Regs., tables is erroneous. Instead, we think section 1.1014-5(a)(3), Income Tax Regs., requires the application of the tables contained in section 20.2031-7, Estate Tax Regs., because the date of sale of petitioner's interest in the trust was after November 30, 1983, and before May 1, 1989. Petitioner was entitled to receive for his life 40 percent of the income from the trust. Respondent computed the total basis to be allocated to 40 percent of the trust as $ 722,233.20 ($ 1,805,583 x 40 percent). She then adjusted that figure by reference to the factor contained in section 20.2031-7, Estate Tax Regs., to reflect petitioner's income interest to arrive at her determination that petitioner's basis was $ 599,229.66 ($ 722,233.20 x .82969). In essence what respondent has done is to multiply a 40-percent income and remainder interest by .82969 to arrive at a factor of .331876, which represents, petitioner's percentage share of the uniform basis ($ 1,805,583 x .331876 = $ 599,229.66). In determining petitioner's *98 allocable share of the $ 1,500,000 proceeds respondent used a two-step computation. [4] First, she determined the relative value of a 40-percent income interest and an 8 percent remainder interest, or a combined 48-percent income and remainder interest; i.e., 40 percent divided by 48 percent equals 83.33 percent. In this manner respondent determined that of the $ 1,500,000 received, a 40-percent income interest was entitled to a share of $ 1,249,950 ($ 1,500,000 x 83.33 percent). Because petitioner did not have a remainder interest, respondent then adjusted the $ 1,249,950 figure to determine the allocable share of an income interest held by an individual of petitioner's age at the time of sale. Respondent made this adjustment by again referring to the income factor contained in the tables of section 20.2031-7, Estate Tax Regs. Respondent thereby concluded that petitioner's share of the cash proceeds was $ 1,037,071 ($ 1,249,950 x .82969). In determining the share of proceeds allocable to a 40-percent income interest, respondent's methodology is more simply stated as: 69.13806 percent (83.33 percent x .82969) times total proceeds of $ 1,500,000 equals $ 1,037,071. *99 Using this methodology, respondent determined that petitioner had a net gain of $ 128,766.54 (petitioner's share of net proceeds of $ 1,037,071 minus his allocable share of attorney's fees and costs of $ 309,074.81 [5] less basis of $ 599,229.66 equals $ 128,766.54). Except as otherwise provided, section 1014(a)(1) provides, as a general rule, that the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent, if not sold, exchanged, or otherwise disposed of before the decedent's death, is the fair market value of the property at the date of decedent's death. Section 1.1014-4(b), Income Tax Regs., provides: Where more than one person has an interest in property acquired from a decedent, the basis of such property *100 shall be determined and adjusted without regard to the multiple interests. The basis for computing gain or loss on the sale of any one of such multiple interests shall be determined under section 1.1014-5.* * *
Section 1.1014-5(a)(1), Income Tax Regs., which sets out a special rule in the case of a joint sale or transfer of property by both the life tenant and the remainderman, provides in pertinent part: gain or loss from a sale or other disposition of a life interest, remainder interest, or other interest in property acquired from a decedent is determined by comparing the amount of the proceeds with the amount of that part of the adjusted uniform basis which is assignable to the interest so transferred. The adjusted uniform basis is the uniform basis of the entire property adjusted to the date of sale or other disposition of any such interest as required by sections 1016 and 1017. The uniform basis is the unadjusted basis of the entire property determined immediately after decedent's death under the applicable sections of Part II of subchapter O of chapter 1 of the Code.
Section 1.1014-5(a)(2), Income Tax Regs., explains that when ascertaining the basis of the *101 life interest, remainder interest, or other interest which has been so transferred, the uniform basis rule contemplates that proper adjustments will be made to reflect the relative change in value of the interests on account of the passage of time. Section 1.1014-5(a)(3), Income Tax Regs., provides that the factors set forth in the tables contained in section 20.2031-7 or section 20.2031-10, Estate Tax Regs., whichever is applicable, are to be used in the manner provided therein in determining the basis of the life interest or remainder interest in the property on the date such interest is sold. Section 1.1014-5(a)(3), Income Tax Regs., further provides that: The basis of the life interest, the remainder interest, or the term certain interest is computed by multiplying the uniform basis (adjusted to the time of the sale) by the appropriate factor. In the case of the sale of a life interest or a remainder interest, the factor used is the factor (adjusted where appropriate) which appears in the life interest or the remainder interest column of the table opposite the age (on the date of the sale) of the person at whose death the life interest will terminate. * * *
In view *102 of this regulatory framework, we agree with respondent that petitioner's reliance on section 20.2031-10, Estate Tax Regs., is misplaced. This is not an estate tax case where we are asked to value the decedent's gross estate, but rather an income tax case in which we are valuing the interest acquired by petitioner. Pursuant to section 1.1014-5(a)(3), Income Tax Regs., the date for valuing the transfer of life interests and remainder interests is the date of sale, not the date the life interests or remainder interests were created. Therefore, the applicable table is determined by reference to the December 31, 1987, date of sale, rather than the April 7, 1981, date of death. Properly determining basis is accomplished by taking the value of the property at the time of sale multiplied by the factor in column 3 (life estate) of the table A contained in section 20.2013-7, Estate Tax Regs., nearest to the actual age of the measuring life (petitioner) at the time of sale. Cf. Estate of Simmie v. Commissioner, 69 T.C. 890, 892-894 (1978), affd. 632 F.2d 93 (9th Cir. 1980). Petitioner was 51 years, 11 months, and 30 days old on *103 December 31, 1987, the date of sale. Under Table A of section 20.2031-7, Estate Tax Regs., the factor for determining the value of a life estate for an individual age 52 is .82969. It is in this manner that respondent made her determination. We think it is correct. Accordingly, we sustain respondent's determination that petitioner's gain in excess of his basis is $ 128,766.54. The principal dispute driving the disposition of this issue is respondent's position that petitioner is required to recognize, as additional sale proceeds, his proportionate share of the trustee's agreement to assume and discharge the estate's Federal estate tax liability. As of December 31, 1987, the Estate of Dorothy Garrett had an outstanding Federal estate tax liability of $ 1,305,932, exclusive of accrued interest. Respondent contends that petitioner as a beneficiary had an interest in the property of the trust which was subject to a Federal estate tax lien. Relying on Crane v. Commissioner, 331 U.S. 1 (1947), she argues that petitioner must also recognize as additional income his proportionate share of the $ 1,305,932 Federal estate tax liability assumed by the bank *104 pursuant to the Purchase and Sale and Settlement Agreement. Respondent allocated petitioner's share of the encumbrance proceeds in the same manner described above; i.e., 40 percent times $ 1,305,932 times .82969 equals $ 433,047.05. Respondent then determined that the amount of income petitioner realized in 1988 from the bank's agreement to pay the outstanding Federal estate tax liability is $ 870,888.40. In other words, petitioner's basis of $ 599,229.66 less encumbrance proceeds of $ 433,047.05 equals the remaining basis of $ 166,182.61 applied against the allocable share of cash proceeds ($ 1,037,071) received in 1988 equals a recognizable capital gain of $ 870,888.40. To the contrary, petitioner contends that respondent's determination, which offsets his basis by increasing the amount of proceeds received to include the sale of encumbered assets, is erroneous. He maintains that Crane v. Commissioner, supra, does not apply here because he did not sell the trust's assets, but only sold his beneficial interest in the trust. In arguing that there was no sale of encumbered assets, petitioner is attempting to create a distinction that does not *105 exist. The Supreme Court in Blair v. Commissioner, 300 U.S. 5, 13 (1937), held that where a trust entitles a person to a net income from property held in trust, that person is "the owner of an equitable interest in the corpus of the property." The Court explained that the "assignment of the beneficial interest is not the assignment of a chose in action but of the 'right, title and estate in and to property.'" Id. at 13-14 (quoting Brown v. Fletcher, 235 U.S. 589, 599 (1915)). Petitioner further contends that the outstanding Federal estate tax liability is not includable in gross income under section 61(a)(12) as income received from the discharge of indebtedness. He argues that there was no assumption of the legal obligation of another by the bank because he and the other beneficiaries had no obligation, either as beneficiaries or as transferees, [6] *106 to pay the Federal estate tax. He asserts that the Federal estate tax was a trustee obligation for which the bank was, both before and after the sale, personally liable pursuant to sections 6324(a)(2)[7] and 2002. [8]
Petitioner contends that under section 2002 the bank as executor is personally liable for the estate tax. This contention is without merit. Section 2002 simply provides that the estate tax imposed by that chapter shall be paid by the executor. In and of itself it imposes no personal liability for the tax on the executor. See Occidental Life Ins. Co. v. Commissioner, 50 T.C. 726, 729-730 (1968). *107 Section 6901(a) establishes a procedure for the assessment and collection by respondent of income, estate, and gift tax liabilities from fiduciaries and transferee. That section does not establish or define a transferee's or fiduciary's substantive liability. The substantive liability of transferees of nonprobate assets for Federal estate taxes is grounded in section 6324. In order to establish liability under section 6324, respondent must show that (1) the estate tax imposed by chapter 11 was not paid when due and (2) the person in question must be one described in section 6324(a)(2) as having received property includable in the decedent's gross estate under sections 2034 and 2042. See Groetzinger v. Commissioner, 69 T.C. 309, 316 (1977); see also Peterson v. Commissioner, T.C. Memo. 1972-65. The liability imposed by section 6324(a)(2) is in the nature of a direct and primary obligation. Schuster v. Commissioner, 312 F.2d 311, 315 (9th Cir. 1962), affg. 32 T.C. 998, 1006 and revg. First Western Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959); *108 Baptiste v. Commissioner, 100 T.C. 252, 255 (1993); Estate of Whittle v. Commissioner, 97 T.C. 362, 367 (1991), affd. 994 F.2d 379 (7th Cir. 1993). Thus, whether petitioner received income from the discharge of indebtedness depends upon whether the bank assumed a debt for which petitioner was personally liable under section 6324(a)(2) as either a beneficiary or a transferee. The legislative history of section 6324(a)(2) reveals that for purposes of that section the term "beneficiary" is not used in its broad sense, but rather has a narrower, more restrictive meaning. Section 6324(a)(2) is derived from section 827(b), Internal Revenue Code of 1939, which in turn was derived from section 315(b) of the Revenue Act of 1926, ch. 27, 44 Stat. 9, 80. Section 315(b) provided in pertinent part: If (1) the decedent makes a transfer, by trust or otherwise, of any property in contemplation of or intended to take effect in possession or enjoyment at or after his death (except in the case of a bona fide sale for adequate and full consideration in money or money's worth) or (2) if insurance passes *109 under a contract executed by the decedent in favor of a specific beneficiary, and if in either case the tax in respect thereto is not paid when due, then the transferee, trustee, or the beneficiary shall be personally liable for such tax * * * [Emphasis added.]
The question of whether under section 315(b) of the Revenue Act of 1926 a beneficiary of an existing trust was personally liable to pay the estate tax levied against an estate of which the trust corpus was a taxable part was addressed in Higley v. Commissioner, 69 F.2d 160 (8th Cir. 1934), remanding a Memorandum Opinion of this Court. [9] In holding that the taxpayer was not personally liable as either a beneficiary or a transferee under section 315(b), the Court of Appeals for the Eighth Circuit stated (69 F.2d at 162-163): The section deals with two general classes of disposition, before death, of property by the decedent. The first of these is "transfers"; the second is "insurance." "Transfers" expressly include trusts. While cestui que trustent are ordinarily called "beneficiaries," both in legal and every-day speech, yet it is obvious the use of the *110 word "beneficiary" in this section applies only to insurance policy beneficiaries. * * * If a trust beneficiary is to be personally liable under this section, it must be because he is a "transferee." In a broad sense, and irrespective of this section, such a beneficiary might be regarded as a "transferee" under a trust instrument. In the same sense, a trustee, who takes the entire legal title, is certainly a "transferee" under such an instrument. In short, one (the trustee) would always be regarded as a transferee and the other (the beneficiary) might be so regarded. * * * The result is that application of "transferee" to trust beneficiaries is at least doubtful and the statute in that respect ambiguous. In such a situation the beneficiary is entitled to a favorable construction because liability for taxation must clearly appear. [Citations omitted; emphasis added.] * * * Again, the results flowing from such a personal liability easily explain why Congress would not impose it, and they argue for a construction of doubtful language against such construction. It is common knowledge that the most usual purpose of creating trusts in contemplation of or to be enjoyed after *111 death of the creator thereof is to provide for children or other dependents. Very often such trusts pass only the income from a trust estate to the beneficiary. To require such beneficiary to be personally liable for the estate tax (in whole or part) would result in dire hardship in many instances. It is very natural to presume that Congress deemed payment of the tax sufficiently secured by a lien on the property and by imposing a personal liability on the trustee without going further and placing this real hardship on beneficiaries who would often be hopelessly unable to bear it.
In Englert v. Commissioner, 32 T.C. 1008 (1959), a case factually similar to the instant case, the Commissioner *112 urged that Higley was no longer applicable, contending that section 827(b) of the 1939 Code, as amended by the Revenue Act of 1942, represented Congressional intent to broaden the scope of the term "beneficiary" so as to subject a trust beneficiary to personal liability. After reviewing the legislative history [10] of section 827(b) of the 1939 Code, this Court rejected the Commissioner's broad interpretation of the term. We concluded that the personal liability imposed upon beneficiaries referred only to specific beneficiaries of life insurance. It was explained that We believe, * * * Congress used the word 'receives' to take care of property received by persons solely because of decedent's death such as insurance proceeds or property which was not in the possession of one of the persons described in section 827(b), as amended, at the moment of decedent's death, but who immediately received such property solely because of decedent's death. [Id. at 1016.]
*113 As one commentator has observed, a life insurance company is not subjected to liability either as a transferee or a trustee. Personal liability is imposed on the insurance beneficiaries. On the other hand, when an inter vivos trust is includable in the gross estate, personal liability is not imposed on the beneficiaries but on the trustee. The soundness of this result has been praised in situations similar to the one before us, where the liability is asserted while the trustee still holds funds from which to indemnify himself, and while the beneficiary has only a contingent, or at best, a future vested interest. See Plumb, Federal Tax Liens 324-326 (3d ed. 1972). The language and sequence of the relevant portion of section 6324(a)(2) is substantially the same as former section 827(b). We find nothing in the current statutory language that would warrant a more expansive definition of "beneficiary" or a departure from earlier precedent under section 827(b). Thus, having concluded that petitioner had no personal liability as a beneficiary for the unpaid tax, we must consider whether he was personally liable as a transferee. Whether a trust beneficiary was liable as a transferee *114 under section 827(b) was also addressed in Englert v. Commissioner, supra, wherein the Commissioner argued that because the trustee had transferred property to the taxpayer, the taxpayer was the "transferee of a transferee". Id. at 1016. This Court, relying on Equitable Life Assurance Society v. Commissioner, 19 T.C. 264, 267 (1952), rejected this liability-by-secondary-transfer argument, applying a "more definite and restrictive meaning" to the term transferee. Id. We concluded that, for purposes of section 827(b), the term "transferee" applied only to the person who on the date of decedent's death receives or holds the property of a transfer made in contemplation of, or taking effect at, death. In the related case of First Western Bank & Trust v. Commissioner, 32 T.C. 1017 (1959), modified on other grounds sub nom. Schuster v. Commissioner, 312 F.2d 311 (9th Cir. 1962), we held that the taxpayer, who was the trustee, was personally liable as a transferee for the estate tax because it was in possession of property *115 includable in decedent's gross estate at the date of death. See Estate of Callahan v. Commissioner, T.C. Memo. 1981-357. As previously noted, the language of the relevant portion of section 6324(a)(2) is substantially the same as section 827(b) of the 1939 Code, and likewise does not impose liability on a transferee other than the direct transferee of the decedent. At the date of the decedent's death, it was the bank, as trustee, not petitioner, who was in possession of the property transferred by the decedent. Even if we were to disregard petitioner's argument that the proceeds derived from assets outside of the trust, petitioner as a transferee of a transferee would not come within the definition of transferee under section 6324(a)(2). Accordingly, we agree with petitioner. We hold that the bank's assumption of the estate's outstanding Federal estate tax liability is not includable in petitioner's gross income as the discharge of indebtedness under section 61(a)(12). Petitioner was not personally liable for the payment of the Federal estate tax either as a beneficiary or a transferee, and therefore he was not required to recognize income under *116 section 61(a)(12) upon the bank's assumption of the obligation. Instead, the bank, as trustee, was personally liable for the payment of the Federal estate tax under section 6324(a)(2). It was the trustee who received the property included in the decedent's gross estate and it had the legal title, control, and possession of such property. Moreover, because the bank, as trustee, was liable for payment of the Federal estate tax, the payment of its own primary obligation can in no way be considered payment of the debt of another. We reject respondent's attempt to increase petitioner's proceeds of sale by applying the rationale of Crane v. Commissioner, 331 U.S. 1 (1947), and Commissioner v. Tufts, 461 U.S. 300 (1983). Reliance on Crane and Tufts is misplaced. Petitioner did not sell any assets to the bank, as trustee, which were subject to an encumbrance. There was no transfer of title to property from petitioner which would trigger the application of the Crane doctrine. By the same token, respondent's reliance on Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), to *117 support the argument that "assumption of another's legal obligation or debt is considered income" is inapposite in these circumstances. Petitioner had no obligation to pay the Federal estate tax. That was the personal liability of the bank, as trustee. Issue 2. Taxability of the Gain Realized
A. Claimed Exclusion Under Section 102(a)
Petitioner contends that the amount of the gain he received from the $ 1,500,000 paid pursuant to the December 31, 1987, agreement is excludable from his gross income under section 102(a) because it was property acquired in lieu of inheritance. He argues that his claim against the bank was based on his loss of inheritance and his attempt to redress that loss, which allegedly resulted from the bank's mismanagement of the trust property. Petitioner relies primarily on Lyeth v. Hoey, 305 U.S. 188 (1938), wherein the Supreme Court decided under section 22(b)(3), the forerunner of section 102(a), that what was received by an heir to a will in accordance with an agreement settling a will contest is excludable from gross income. Respondent, on the other hand, contends that the Lyeth case is factually distinguishable *118 because, unlike the taxpayer in Lyeth, petitioner did not receive proceeds in his capacity as an heir from the settlement of a will contest, but rather as a beneficiary of a trust which was created under a contractual relationship between the decedent and the bank. Here it is clear that petitioner did not receive proceeds from the bank in settlement of a will contest. Unlike the taxpayer in Elrick v. Commissioner, 56 T.C. 903 (1971), revd. 485 F.2d 1049 (D.C. Cir. 1973), petitioner was an heir to his mother's estate. However, he did not challenge the validity of her will or his share of the estate under the provisions of her will. In fact, petitioner and his sister expressly represented in the December 31, 1987, agreement that neither of their families has any claim against the decedent's estate. Petitioner's lawsuits against the bank, as trustee, which were filed more than 3 years after the decedent's death, were to recover the diminution of his income interest in the trust. Those actions were not will contests, and any settlement proceeds petitioner received from the bank were not in lieu of the bequest from his *119 mother's estate. Petitioner inherited a 40-percent income interest in the trust upon his mother's death. The value of that interest, as of April 7, 1981, when his mother died, was excludable from his gross income under section 102(a). But any income he received from that interest was includable in his gross income under section 102(b)(2). The resolution of this issue turns upon whether the settlement proceeds represented property or income from property; i.e., what was the payment in lieu of? Both this Court and the Court of Appeals for the Ninth Circuit agree that where a payment is in lieu of an income interest, it is includable in gross income under section 102(b). Getty v. Commissioner, 91 T.C. 160, 176 (1988), revd. 913 F.2d 1486, 1492 n.7 (9th Cir. 1990). [11] Petitioner had only a right to income from property held by the bank, as trustee. "Sums received in replacement of taxable income are generally taxable." Id. at 177 (citing Moholy v. United States, 235 F.2d 562, 564 (9th Cir. 1956)). *120 Accordingly, we hold that the amount petitioner realized from the December 31, 1987, agreement is not excludable from his gross income as an inheritance or an amount received in lieu of inheritance under section 102(a). B. Claimed Exclusion Under Section 104(a)(2)
Alternatively, petitioner contends that the proceeds he received in excess of his basis were paid in settlement of his claim for personal injuries arising out of the bank's alleged tortious breach of fiduciary duty in allowing the value of the trust assets to be diminished. To the contrary, respondent maintains that petitioner did not receive any proceeds attributable to damages on account of personal injury. Gross income includes all income from whatever source derived. Sec. 61(a). Section 104(a)(2) excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries. Section 1.104-1(c), Income Tax Regs., provides, in part, that damages received means an amount received through prosecution of a legal suit or action based on tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution. The law is settled that the *121 tax consequences of an award for damages depends on the nature of the litigation and the origin and character of the claims adjudicated, but not on the validity of such claims. United States v. Burke, 504 U.S.    , 112 S. Ct. 1867 (1992). The proper inquiry is "in lieu of what" were the damages awarded. Church v. Commissioner, 80 T.C. 1104, 1107 (1983). In determining whether the proceeds derive from a sale or from a settlement on account of personal injuries, the parties focus on the Purchase and Sale and Settlement Agreement dated December 31, 1987. Titled as it is, the agreement purports to be both sale and settlement. It provides no clear indication as to its underlying nature. Where, as here, the settlement agreement lacks express language stating the basis of the payment, it is necessary to consider the intent of the payor in making the payment. See Knuckles v. Commissioner, 349 F.2d 610, 612 (10th Cir. 1965), affg. T.C. Memo. 1964-33. Factors that may be relevant to the characterization of a settlement agreement are the allegations contained in *122 the taxpayer's complaint, the evidence presented and the arguments made in the court proceeding, and the intent of the payor. Threlkeld v. Commissioner, 87 T.C. 1294, 1306 (1986), affd. 848 F.2d 81 (6th Cir. 1988); Bent v. Commissioner, 87 T.C. 236, 245 (1986), affd. 835 F.2d 67 (3d Cir. 1987); Church v. Commissioner, supra.
While under the laws of Idaho the breach of a fiduciary duty gives rise to an action in tort, Irwin Rogers Ins. Agency, Inc. v. Murphy, 833 P.2d 128, 132 (Idaho Ct. App. 1992), the technicalities of a particular State's pleading and practice do not control our decision. Getty v. Commissioner, 91 T.C. at 173. The gravamen of petitioner's complaint was the loss of an income stream caused by the diminution in value of the trust's assets due to the bank's alleged mismanagement. Count One of the original complaint filed in the Bannock County suit alleged that but for the bank's breach of fiduciary duty, petitioner and his children would have received *123 income distributions of $ 475,000. In Count One of the amended complaint the amount of alleged lost income was $ 2 million. To restore future income distributions to the level they would have been before the decrease in value of the assets, the complaints also sought restoration of $ 4 million to the trust. The complaints did not allege any injury other than economic loss. As previously indicated, the December 31, 1987, agreement lacks any express language from which the intent of the parties can unequivocally be determined. However, we think the following facts are significant: (1) Petitioner reported the transaction as a sale for which he realized capital gain; (2) petitioner demonstrated his understanding that the nature of the transaction was a sale when he applied what he considered his allocable share of the basis to offset his capital gain; (3) petitioner alleged in his petition that respondent erred in determining that he received proceeds from the settlement of lawsuits; (4) petitioner continued in his brief to maintain that his reporting of the transaction as a sale was proper; and (5) while the notice of deficiency characterized the proceeds as derived from the settlement *124 of lawsuits, respondent now agrees that the proceeds were received by petitioner from the sale of his income interest in the trust. Although it is unclear why the bank would have paid an amount in excess of the value of the trust assets, there is nothing in the record before us which precludes our acceptance of the parties' characterization of the transaction as a sale. A taxpayer should ordinarily be taxed in accordance with the form in which the transaction was actually cast, not in another form which he could have used. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974). Petitioner must bear the consequences for any vagueness in the purpose of the agreement. To be sure, the agreement does not specify what portion of the proceeds petitioner received was for the sale of his income interest in the trust and what portion, if any, was for the settlement of the lawsuits. There is no evidence in the record that the parties intended to make any allocation to petitioner's claims for compensatory and punitive damages. In the absence of such evidence, there is no rational basis for making an allocation. We are unwilling *125 to do what the parties to the agreement failed to do. Furthermore, petitioner has not proved what tortlike personal injury he may have suffered, may have sued over, and for which he may have received a settlement. In United States v. Burke, supra, the Supreme Court reviewed the issue of both physical and nonphysical torts. It decided that section 104(a)(2) encompassed a broad range of physical and nonphysical injuries to personal interests. The Supreme Court stated that the victim of a nonphysical tort may recover not only for any actual pecuniary loss (e.g., loss of business or customers) but also for impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Here petitioner filed lawsuits against the bank based upon its alleged breach of fiduciary duty in making poor investments and wasting assets of the trust. The only injury alleged by petitioner was economic in nature rather than personal, and the damages sought did not include traditional tort relief. Petitioner did not recover for a nonphysical injury to his personal interest, such as an impairment of reputation, personal humiliation, *126 or mental anguish and suffering. If the trust had worked as planned from its inception, petitioner would have paid taxes only on income received from it. His lawsuits were entirely directed to the diminution of the trust assets necessary to generate income payable to him. The proceeds he received were due to the loss of an income stream from the trust. In summary, we conclude that no portion of the proceeds petitioner received pursuant to the December 31, 1987, agreement is excludable from gross income under section 104(a)(2) as damages on account of personal injury. Issue 3. Discharge of Indebtedness
Gross income includes income from the discharge of indebtedness. Sec. 61(a)(12). The general theory is that to the extent that a taxpayer has been released from indebtedness, he has realized an accession to wealth because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness. United States v. Kirby Lumber Co., 284 U.S. 1 (1931). Whether a debt has been discharged depends on the substance of the transaction. Mere formalisms arranged by the parties are not binding in the application *127 of the tax laws. Commissioner v. Court Holding Co., 324 U.S. 331 (1945). As of December 31, 1987, petitioner owed the trust $ 73,930 on a promissory note and $ 16,482 for insurance premiums the trust had paid on his behalf. Respondent contends that as a result of the bank's agreement to dismiss its counterclaim against petitioner for all delinquent payments relating to the loan and the life insurance premiums paid, petitioner received income in 1987 from debt forgiveness in the total amount of $ 90,412. Petitioner's primary position is that he had no relief from indebtedness which would constitute income under section 61(a)(12) because he had no personal liability to repay the loan other than from his right to receive income generated from the trust. In the alternative, he contends that no liability for alleged debt forgiveness exists under section 108(e)(4)(A). We disagree with petitioner's contention that he had no personal liability for repayment of the loan. He has confused the concept of indebtedness with the remedies available to the obligee for collection. The Memorandum Agreement and the promissory note executed in accordance therewith *128 evidence petitioner's indebtedness. When the bank, as trustee, loaned petitioner the funds to repay his obligation to the estate, petitioner became indebted to the trust. That the terms of the Memorandum Agreement limited the method of collection to petitioner's right to income generated from the trust assets (or to the insurance proceeds in the event of petitioner's death) does not alter the fact that petitioner had a bona fide debt owed to the trust. In Commissioner v. Tufts, 461 U.S. 300 (1983), the taxpayers disposed of property encumbered by a nonrecourse obligation exceeding its fair market value. The Supreme Court explained that the only difference between that mortgage and one in which the borrower is personally liable is that the mortgagee's remedy is limited to foreclosure on the securing property. The Supreme Court explained that this difference does not alter the nature of the obligation; its only effect is to shift from the borrower to the lender any potential loss caused by devaluation of the property. We conclude that as of December 31, 1987, when the parties entered into the Purchase and Sale and Settlement Agreement, petitioner *129 had a bona fide debt for which he was personally liable. Under the terms of the December 31, 1987, agreement, petitioner was relieved of his obligation to repay in full the remaining outstanding principal balance plus accrued interest due on January 1, 1988. When a taxpayer is relieved of indebtedness for less than the amount owing, the difference constitutes income to him because he realizes an economic benefit by way of an increase in his net worth. Cf. Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955); United States v. Kirby Lumber Co., supra.Consequently, we hold in these circumstances that there was a discharge of indebtedness under section 61(a)(12) that resulted in gross income to petitioner. Petitioner's alternative argument that the discharge of indebtedness is excludable from income under section 108(e)(4)(A) is similarly without merit. That section provides in pertinent part: (4) Acquisition of indebtedness by person related to debtor. -- (A) Treated as acquisition by debtor. -- For purposes of determining income of the debtor from discharge of indebtedness, to the extent provided *130 in regulations prescribed by the Secretary, the acquisition of outstanding indebtedness by a person bearing a relationship to the debtor specified in section 267(b) or 707(b)(1) from a person who does not bear such a relationship to the debtor shall be treated as the acquisition of such indebtedness by the debtor. * * *
Respondent points out that there is no evidence in the record that indicates the bank "purchased" petitioner's indebtedness. It only dismissed with prejudice its counterclaim against petitioner in the Bannock County lawsuit and released all claims that it or the trust had against him. While the bank as trustee is a "related party" under section 267(b)(6), the bank did not purchase the indebtedness from an unrelated party. Therefore, petitioner realized income from the discharge of indebtedness in the amount of $ 90,412 in 1987. Issue 4. Section 6651(a)(1) Additions to Tax
Section 6651(a)(1) provides that when a taxpayer fails to timely file a required Federal income tax return (determined with regard to any extension of time for filing) and such failure is not due to reasonable cause but rather to willful neglect, there shall be added 5 percent of *131 the amount of tax required to be shown on the return for each month the return is not filed, not to exceed 25 percent in the aggregate. Willful neglect has been interpreted to mean a conscious, intentional failure or reckless indifference. United States v. Boyle, 469 U.S. 241, 246 (1985). A mere showing that the failure to file a return was not due to willful neglect is insufficient to avoid the addition to tax. A taxpayer must also prove the presence of reasonable cause. Rembusch v. Commissioner, T.C. Memo. 1979-73. In order to prove reasonable cause the taxpayer must show that, despite the exercise of ordinary business care and prudence, he was nevertheless unable to file the return within the prescribed time. Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Section 6072(a) provides that calendar year taxpayers must file their Federal income tax returns by the 15th day of April following the close of such calendar year. Pursuant to the authority granted in section 6081(a), section 1.6081-4, Income Tax Regs., provides in part as follows: *132 (a) In general. (1) An individual who is required to file an income tax return on Form 1040 for any taxable year ending on or after December 31, 1982, shall be allowed an automatic 4-month extension of time to file such return after the date prescribed for filing of the return only if the requirements contained in subparagraphs (2), (3), and (4) of this paragraph are met. * * * [Emphasis added.]
It is not disputed that petitioner satisfied the requirements of subparagraphs (2) and (3). But respondent contends that he failed to satisfy the requirements of section 1.6081-4(a)(4), Income Tax Regs., and therefore the extensions are invalid. Section 1.6081-4(a)(4) provides that the application: must show the full amount properly estimated as tax for such taxpayer for such taxable year, and such application must be accompanied by the full remittance of the amount properly estimated as tax which is unpaid as of the date prescribed for the filing of the return. [Emphasis added]
Under section 1.6081-4(a)(4), Income Tax Regs., a taxpayer need not estimate his liability with exactitude because such a requirement would be unreasonable. Crocker v. Commissioner, supra at 907. *133 In order to satisfy the duty to "properly estimate", a taxpayer must make a bona fide and reasonable estimate of his tax liability based on the information available to him at the time he makes his request for extension. Id. at 908. While exactitude is not required, a taxpayer must judge or determine his tax liability generally, but carefully. "Thus, if a taxpayer, in his Form 4868 request for automatic extension, estimated his tax liability to be zero, even though he had, at the time he submitted the request, ample evidence discrediting the estimate, the Form 4868 would be invalid." Id.
Respondent contends that on April 15, 1988, petitioner had sufficient information available to him to make a bona fide and reasonable estimate of his 1987 income tax liability stemming from the forgiveness of his debt to the trust. Respondent also contends that by April 15, 1989, petitioner likewise had sufficient information available to make a reasonable estimate of his tax liability as a result of having received his portion of the $ 1,500,000 from the bank. We will address each year separately. With respect to the taxable year 1987, we do not agree with *134 respondent that petitioner's Form 4868 was invalid because he failed to properly estimate his income tax liability. Although we have held that petitioner did receive income from the forgiveness of the $ 90,412 indebtedness, we do not find unreasonable his belief that under the terms of the Memorandum Agreement and promissory note he was not personally liable for repaying the debt. This appears to be consistent with his position in his answer to the bank's counterclaim in the Bannock County lawsuit. Therefore, we conclude that at the time petitioner filed the 1987 automatic extension he made a good faith, albeit ultimately mistaken, estimate that his tax liability was zero. Because the extensions for 1987 were valid, petitioner's Federal income tax return was due to be filed on October 17, 1988. However, the return was not filed until February 6, 1989. Petitioner has presented no evidence that his failure to timely file was due to reasonable cause and not willful neglect. Accordingly, we hold that he is liable for an addition to tax under section 6651(a)(1) covering the 4-month period he was delinquent. With respect to the taxable year 1988, we reach a different result. Petitioner, *135 in estimating a zero tax liability for 1988, failed to make a reasonable estimate based on the information available to him at the time he made his request for an automatic extension. The agreement entered into with the bank was signed on December 31, 1987, some 15 months prior to petitioner's request for an automatic extension. At that time he knew the amount of cash proceeds received, his proportionate share of those proceeds, and, based on the preliminary draft of a compiled financial statement prepared by Arthur Anderson & Co. (which legal counsel for the estate represented to be accurate), the adjusted basis of trust assets. In addition, he had sufficient information as to the interest income received from American Title and the Garrett Family Trust, as well as amounts received from the 1984 installment sale of land in Bannock County. From this information, petitioner could have estimated his income tax liability for 1988 with a reasonable degree of accuracy. In his request for an automatic extension, petitioner asserted that additional time was needed to obtain information from third parties. We are perplexed as to the identity of such third-party sources or what information *136 petitioner required from those sources in order to make a reasonable estimate. It appears from the record before us that he possessed all the information necessary to make a reasonable estimate. However, even if that were not the case, in order to be treated as having "properly estimated" his tax liability, a taxpayer must make a bona fide and reasonable attempt to locate, gather, and consult information which will enable him to make a proper estimate of his tax liability. Petitioner has failed to demonstrate what attempts, if any, he made to obtain the additional information he purportedly required. Moreover, we note that petitioner did not estimate his tax liability at zero based on any theory that the amounts received were excludable from gross income. On his 1988 Federal income tax return he treated the transaction as a sale, and he has continued to assert the correctness of such characterization. It was not until the petition was filed in this case that petitioner first advanced his alternative positions of income exclusion under section 102(a) or section 104(a)(2). We therefore conclude that the automatic extension for the taxable year 1988 is invalid. Other than contending *137 that the facts of this case are "quite complex" and that he and respondent had not been able to arrive at any agreement as to the tax treatment of the transactions involved, petitioner has presented no evidence to show reasonable cause. Indeed, his contentions make his estimate of a zero tax liability appear all the more unreasonable, especially when he ultimately reported income tax due of $ 48,899. While the effect of the December 31, 1987, agreement may have presented petitioner with a more complex reporting situation than in past years, he had available at all times legal and accounting professionals from whom he could have sought advice. Accordingly, in these circumstances, we hold that petitioner is liable for the section 6651(a)(1) addition to tax for 1988. To reflect our conclusions with respect to the disputed issues and respondent's concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The first and second issues in the instant case are also being litigated in C. Anson Garrett, III v. United States, Civil No. 93-0107-S-MJC (D. Idaho filed March 30, 1993), and in Daniel A. Carter and Anita J. Carter v. Commissioner↩, docket No. 10139-93, in this Court, filed May 20, 1993.
3. In valuing a decedent's gross estate under sec. 2031, sec. 20.2031-10, Estate Tax Regs., is applicable to the valuation of annuities, life estates, terms of years, remainders, and reversions for estates of decedents dying after Dec. 31, 1970, and before Dec. 1, 1983, and sec. 20.2031-7↩, Estate Tax Regs., is applicable in valuing such interests of decedents dying after Nov. 30, 1983 and before May 1, 1989.
4. Petitioner does not disagree with respondent's computation if sec. 20.2031-7↩, Estate Tax Regs., applies.
5. Respondent determined petitioner's allocable share of the attorneys' fees and expenses in the same manner used in determining his share of basis and proceeds; i.e., $ 447,040 times 83.33 percent times .82969 equals $ 309,074.81.↩
6. With respect to transferee liability, petitioner maintains that the $ 1,500,000 was not a distribution from the trust, but that it was paid from assets outside the trust for the beneficiaries' interests in the trust.↩
7. Sec. 6324(a)(2) provides in pertinent part: (2) Liability of transferee and others. -- If the estate tax imposed by chapter 11 is not paid when due, then the spouse, transferee, trustee * * * surviving tenant, person in possession of the property by reason of the exercise, nonexercise, or release of a power of appointment, or beneficiary, who receives, or has on the date of decedent's death, property included in the gross estate under sections 2034 to 2042↩, inclusive, to the extent of the value, at the time of the decedent's death, of such property, shall be personally liable for such tax. * * *
8. Sec. 2002↩ provides that the tax imposed by this chapter shall be paid by the executor.
9. In Biddle Trust v. Commissioner, 3 T.C. 832, 835 (1944), this Court followed the Court of Appeals for the Eighth Circuit's decision in Higley v. Commissioner, 69 F.2d 160↩ (8th Cir. 1934), remanding a Memorandum Opinion of this Court.
10. This Court cited the explanation of the amendment contained in H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 372, 495, which provided: Section 827(b), as it now appears in the Code, in imposing personal liability for tax refers only to transfers in contemplation of death or intended to take effect in possession or enjoyment at or after death, and life insurance in favor of a specific beneficiary.
We further noted that S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504↩, 681, contained substantially the same explanation.
11. We note that the instant case is distinguishable from Getty v. Commissioner, 91 T.C. 160, 176 (1988), revd. 913 F.2d 1486, 1492 (9th Cir. 1990), because here petitioner's claim was against the trustee for mismanagement of trust assets and is not, as in Getty↩, the type of claim which the testator could have remedied with an outright bequest.